GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH F. BOZDECH
California State Bar No. 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Approximately $6,973,984.14 Held In 2,094 Citibank Accounts Listed In Attachment A.<br><br>Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this verified complaint in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"), and alleges as follows:

## **NATURE OF THE ACTION**

1.     This is a civil action *in rem* to forfeit to the United States of America approximately $6,973,984.14 from the 2,094 Citibank accounts listed in Attachment A (the "Defendant Property") because the funds constitute proceeds traceable to a violation of 18

U.S.C. § 1343 (wire fraud) and are, therefore, subject to civil forfeiture to the United States pursuant to pursuant to 18 U.S.C. § 981(a)(1)(C).

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. §1355, which provides the Court with jurisdiction over forfeiture actions.

3.      The Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. § 1355(b)(1)(A), and venue properly lies in the District of Arizona pursuant to 28 U.S.C. § 1395, because pertinent acts giving rise to the forfeiture occurred in the District of Arizona.

## THE DEFENDANT *IN REM*

4.      The Defendant Property consists of approximately $6,973,984.14 from the 2,094 Citibank accounts listed in Attachment A. The Defendant Property constitutes unemployment insurance benefit payments fraudulently obtained from the State of Arizona's Department of Economic Security (Arizona DES).

5.      Citibank currently maintains custody of the Defendant Property. As background, the Defendant Property was initially seized pursuant to a seizure warrant issued by this Court. The Defendant Property was returned to Citibank because additional funds were included in error. However, there is still probable cause to believe that the Defendant Property constitutes unemployment insurance benefit payments and is therefore subject to seizure and forfeiture.

6.     Because the Defendant Property is not in the government's possession, custody, or control, the United States requests that the Court find that there is probable cause to believe that the Defendant Property is subject to forfeiture and issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(ii). The United States will then execute the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

### STATUTORY BASIS FOR FORFEITURE

7.     The Defendant Property represents proceeds obtained, directly or indirectly, as a result of wire fraud offenses in violation of 18 U.S.C. § 1343 and are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property which constitutes or is derived from proceeds traceable to a "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7). That definition incorporates by reference the offenses listed in 18 U.S.C. § 1961(1), which include wire fraud in violation of 18 U.S.C. § 1343.

### FACTS

**I.     ARIZONA'S UNEMPLOYMENT INSURANCE PROGRAM**

8.     Unemployment Insurance ("UI") is a state-federal program that provides monetary benefits to eligible lawful workers who are unemployed through no fault of their own.

9.     State workforce agencies ("SWAs") administer their respective UI programs but must do so in accordance with federal laws and regulations.

10.    Each SWA sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid.

11.     In Arizona, the Arizona DES is the SWA that administers the state's UI program. Arizona law determines an individual's eligibility for regular UI benefits and the length of time benefits are available.

12.     In general, benefits are calculated based on a percentage of an individual's earnings over a recent 52-week period (the first four of the last five quarters), up to a state-established maximum of $240 per week. In Arizona, as in most other states, benefits can be paid for a maximum of 26 weeks.

13.     The Arizona DES system allows individuals seeking regular UI benefits to submit an online application. The application includes, among other things, the claimant's name, date of birth, Social Security number, and the reason why the claimant is unemployed.

14.     To be eligible for benefits, the claimant: (1) must have been employed by the State of Arizona in the past 12 months; (2) must be currently unemployed; (3) must be able and available to work; and (4) must be actively seeking suitable full-time employment.

## II.     FEDERAL FUNDING FOR PANDEMIC-RELATED UI PROGRAMS

15.     On March 18, 2020, the Families First Coronavirus Response Act ("FFCRA") was signed into law.

16.     The FFCRA provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

17.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law.

18.    The CARES Act expanded states' abilities to provide assistance to many workers impacted by COVID-19, including workers who were not ordinarily eligible for UI benefits.

19.    The CARES Act provided for three temporary UI programs: Pandemic Unemployment Assistance ("PUA"), Pandemic Emergency Unemployment Compensation ("PEUC"), and Federal Pandemic Unemployment Compensation ("FPUC").

20.    The PUA program initially provided up to 39 weeks of benefits to individuals who were: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act; and (2) unemployed, partially employed, unable to work, or unavailable to work due to a specific COVID-19 related reason(s).

21.    Coverage included individuals who exhausted all rights to regular UI or extended benefits under state or federal law or PEUC.

22.    Under the PUA provisions of the CARES Act, business owners, self-employed workers, independent contractors, or gig workers could qualify for PUA benefits administered by Arizona DES if they previously performed such work in Arizona and were unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19 related reason.

23.    Initially, the eligible timeframe to receive PUA included weeks of unemployment beginning on or after January 27, 2020, through December 31, 2020.

24.     PUA claimants could receive a minimum weekly benefit amount of $223.00 and a maximum weekly benefit amount of $618.00.

25.     The PEUC program initially provided for up to 13 additional weeks of payment of an individual's average weekly benefit amount to individuals who had exhausted regular UI under state or federal law, had no rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of Canada, and were able to work, available for work, and actively seeking work.

26.     The eligible timeframe to receive PEUC included weeks of unemployment beginning after the respective state had an established agreement with the federal government (the earliest being April 5, 2020) through December 31, 2020.

27.     The FPUC program provided individuals who were collecting regular UI benefits, PUA, PEUC, and several other forms of unemployment compensation with an additional $600 per week.

28.     The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal agreement (the earliest being April 5, 2020) through July 31, 2020.

29.     On December 27, 2020, the Consolidated Appropriations Act, 2021 — an omnibus spending bill that authorized an additional $200 billion in funding for pandemic-related UI programs — was signed into law. Through a section titled Continued Assistance for Unemployment Workers Act of 2020 (the "Continued Assistance Act"), Congress extended and modified the three temporary UI programs created by the CARES Act (PUA, PEUC, and FPUC) and created a new optional benefit program, Mixed Earners

Unemployment Compensation ("MEUC").

30.     The Continued Assistance Act extended the availability of PUA through March 14, 2021. Additionally, the duration of PUA benefits for eligible individuals was effectively extended from 39 weeks under the CARES Act to a total of 50 weeks.

31.     The Continued Assistance Act also reauthorized PEUC through March 14, 2021, and the amount of PEUC benefits for eligible individuals was extended from 13 to 24 times the individual's average weekly benefit amount.

32.     The Continued Assistance Act reauthorized FPUC at a lesser amount of $300 per week for weeks of unemployment beginning after December 26, 2020 through March 14, 2021.

33.     On March 11, 2021, as the relief benefits authorized by the Continued Assistance Act were about to expire, the President signed the American Rescue Plan Act of 2021, which included approximately $203 billion in additional relief, including reauthorization of PUA, FPUC, PEUC, and MEUC.

34.     Under the American Rescue Plan Act, PUA and PEUC were extended, without interruption, to weeks of unemployment ending on or before September 6, 2021, thereby allowing eligible individuals to collect PUA and PEUC benefits for an additional 29 weeks (79 weeks total for PUA and 53 times the individual's average weekly benefit amount for PEUC).

35.     The $300 FPUC benefit was extended through September 6, 2021.

## III.     ARIZONA DES'S RECEIPT OF FEDERAL PANDEMIC-RELATED UI FUNDING

26.     Pandemic-related UI funding, like other federal payments authorized by Congress, reached SWAs including Arizona DES through the United States Department of the Treasury's General Fund.

27.     The United States Department of Treasury, Bureau of the Fiscal Service ("BFS") manages all federal payments and collections. BFS also provides government-wide accounting and reporting services. BFS manages appropriated funds in part through the Automated Standard Application for Payments ("ASAP"), a completely electronic system used to transfer money quickly and securely to recipient organizations, including SWAs.

28.     Pandemic-related UI funding was transferred to Arizona DES via Automated Clearing House ("ACH") transfers. The ACH network electronically moves money and related payment information quickly and securely from any financial institution account to another. ACH payments are generated by BFS servers located in East Rutherford, New Jersey. The Federal Reserve System servers then transmit the payment information to the servers for the bank holding the funds for the Arizona Treasury. Ultimately, the funds are transferred to Bank of America, which is Arizona DES's financial institution.

29.     To initiate the ACH transfer of federal UI funds, an Arizona DES employee logged on to ASAP to input the necessary information.

## IV.     APPLYING FOR UI BENEFITS WITH ARIZONA DES

30.     The Arizona DES's system allowed individuals to submit an online application for UI benefits, including regular UI benefits as well as UI benefits available under PUA.

31.     Applicants seeking UI benefits under PUA were required to answer specific questions to establish their eligibility, including their name, Social Security number, and mailing address.

32.     PUA applicants were also required to self-certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable to work on or after January 27, 2020 through December 31, 2020.

33.     As a condition of approval, PUA applicants completed two sections within the online application, captioned "Acknowledgement" and "Important Agreement," wherein applicants were required to self-certify that they understood the civil and criminal ramifications for submitting false statements.

34.     Specifically, the Acknowledgment section stated:

> I understand that the self-certification I made on the previous screen is under penalty of perjury and that any intentional misrepresentation in self certifying that I fall into the COVID-19 category I selected on the previous screen is fraud. I understand that if I am found to have committed fraud I may be subject to criminal prosecution.

To continue, the applicant had to check, "Yes, I understand."

35.     Additionally, the Important Agreement section stated:

> Certification acknowledgment: By submitting this application I certify that All information submitted is true and complete, I am responsible to read the PUA Handbook and any other official written material provided to me regarding any benefit program; and I acknowledge that any false statements in this document are punishable pursuant to CFR 625.14 referenced in Section 2102 of CARES Act of 2020, relating to sworn falsification to authorities, and that a person who knowingly makes a false statement or knowingly withholds information to obtain UC or other benefits commits a criminal offense and may be subject to a fine, imprisonment, restitution, and loss of future benefits.

To continue, the applicant had to check, "Yes, I want to file this claim."

36.     As part of the application, applicants entered banking information identifying where applicants wanted Arizona to send the UI payments. Initially, Arizona DES gave approved claimants the option of being paid via a check or ACH transfer from its financial institution, Bank of America. Later, Arizona DES added an option for applicants to receive PUA benefits on a pre-paid debit card.

37.     Approved claimants could request continuous weekly benefits. To do so, the claimants were required to re-certify online every week that they remained unemployed and eligible to continue receiving UI benefits.

38.     The PUA program did not require PUA applicants to submit documentation to establish their identity and prove that they were eligible for benefits, although certain SWAs opted to employ identity verification services and could request additional evidence during the claims process.

39.     The self-certified application used by Arizona DES required PUA applicants to provide their Arizona residential address. However, there was no system for vetting or verifying the address provided before UI benefits were paid.

40.     Arizona DES was not able to cross-reference PUA claims against existing data from employers in Arizona, as they could with claims for regular UI benefits.

V.     **OVERVIEW OF THE FRAUD**

41.     After the enactment of the CARES Act, federal law enforcement identified a dramatic increase in the volume of direct deposits of fraudulent UI benefits.

42.    The Secret Service, in coordination with other federal agencies, including the United States Department of Labor—Office of Inspector General ("DOL-OIG") and the United States Postal Inspection Service, began investigating fraud schemes targeting the UI programs of various SWAs across the United States.

43.    The investigation revealed that organized criminal groups were engaging in schemes to defraud SWAs by using personally identifiable information ("PII") of United States citizens, along with fabricated employment information, to file fraudulent applications for UI benefits online.

44.    As part of the application process, the perpetrators typically designated a financial institution's routing number and an account number to receive the stolen funds.

45.    To obtain account numbers to use to receive UI payments, the perpetrators procured PII of unwitting individuals and used those that information to open unauthorized financial accounts, and/or used money mules[1] with existing financial accounts to conceal the identity, source, and destination of the fraudulently obtained UI benefits deposited.

46.    After the fraud proceeds were deposited in the designated accounts, the proceeds were withdrawn at locations around the country or transferred to other accounts, including accounts overseas.

47.    The perpetrators committing the UI fraud often used multiple email addresses, mailing addresses, IP addresses, Social Security numbers, and bank accounts to

---

[1] "Money mules" are individuals recruited by cybercrime rings to, sometimes unwittingly, move fraud proceeds through the financial system, nationally or internationally.

execute their scheme. Often, the perpetrators would file multiple claims.

48.     Arizona DES was one of the SWAs victimized by the fraud schemes. As a result, millions of dollars in fraudulent obtained UI benefits were unknowingly issued by Arizona DES and routed to bank accounts of the perpetrators' choosing. Specifically, as pertinent to the Defendant Property, as a result of the fraudulent UI benefit claims relevant to this Complaint, Arizona DES caused Bank of America (headquartered in North Carolina) to electronically transfer benefit payments to Citibank, N.A. (headquartered in New York) for deposit into the subject accounts.

## VI.     THE FRAUD INVESTIGATION

### A.     Overview

49.     To investigate such a broad and large-scale fraud involving thousands of actors, accounts, and transactions, DOL-OIG has collected and analyzed data from the SWA's and Citibank on the thousands of UI applications and the thousands of Citibank accounts and their associated UI transactions. This data includes information on email addresses used by applicants and account holders, transactions involving applicants that sometimes cross multiple state UI agencies, and the account holders and applicants themselves.

50.     This data analysis has revealed rampant fraud, resulting in the deposit of the Defendant Property. Further, DOL-OIG and its partners have undertaken to interview some individuals in whose names or to whose purported accounts the UI benefits were issued, and has found that such individuals were likely victims of identity theft, and did not apply for or authorize the routing of the benefit payments issued. The DOL-OIG investigation

to-date is summarized as follows.

**B.    DOL-OIG's Analysis of the Data Associated with the Citibank Accounts and the UI Claims Directing Payment to the Accounts**

*i.    Collection and Analysis of UI Claims Data to Detect Fraud*

51.    Pursuant to its subpoena authority, the DOL-OIG has obtained UI claim information for all 54 SWAs. Although SWAs administer their own separate UI benefit programs, they do so under a framework of federal regulations overseen by the DOL.

52.    Since 2020, the DOL-OIG has received from SWAs, by subpoena and data sharing agreements, certain data elements, including demographic information submitted with the UI claims (the DOL/SWA Data), related to UI claims for regular and enhanced pandemic relief UI benefits.

53.    The DOL-OIG loads the raw data from the SWAs into a read-only database, taking measures to ensure that the data remains consistent with SWA datasets. If any data anomalies are identified, DOL-OIG data scientists contact the SWA to ensure receipt of complete data elements, and the SWA retransmits their data if necessary. DOL-OIG then processes and summarizes the SWA data to a claimant-level for each SWA, and also includes the data in its nationwide UI database.

54.    Data scientists and special agents with a need to access the database can access this data in a read-only manner to conduct commonality testing on various fraud indicators, as well as crossmatch it with other data sets. By accessing the information in read-only format, DOL-OIG prevents inadvertent errors and ensures the integrity of all SWAs' data.

55.     Compiling the DOL/SWA data in an accessible database furthers active investigations and generates new leads for DOL-OIG and its federal and state law enforcement partners.

56.     DOL-OIG uses its UI-based system to conduct large scale, national data analytics of the DOL/SWA Data received from SWAs and detect UI fraud. Unlike single-state fraud detection processes, the DOL-OIG's electronic system can detect fraudulent claims with commonalities across multiple states.

57.     DOL-OIG data scientists have specialized experience and knowledge of data mining and analytics techniques. They are knowledgeable in programming languages such as JAVA, R, Python, Anaconda, SQL, C++, SAS, and/or customized programming scripts. They can design and develop new data requirements to discovery and solve known business problems and/or demonstrate patterns, trends, relationships, and/or anomalies of particular data sets. The data scientists can take statistical and computational analyses and create static and dynamic visualizations, such as motion charts, digital maps, and word maps that clearly provide insight of data and corresponding analytics. DOL-OIG data scientists generally have advanced degrees and specialized knowledge in data analytics and processing. They are also regularly trained in DOL-OIG program areas and complete yearly training in data science-related courses to ensure they maintain current skills.

58.     Through extensive training and experience, DOL-OIG data scientists and special agents have identified data patterns that are associated with fraudulent UI claims. These data patterns are evident as to the UI claims and accounts involving the Defendant Property.

### ii.    Analysis of the Demographic Information Associated with the Citibank Accounts and the Associated UI Claims

59.    Specifically, as part of its fraud investigation, the United States obtained documentation pertaining to the Citibank accounts, including demographic data on the reported owners of the suspected fraudulent accounts. The data included information such as first name, last name, Social Security number, date of birth, residential address, city, state, and email address (the Citibank Demographics).

60.    DOL-OIG data scientists and special agents conducted focused data analyses of the DOL/SWA data for the UI claims associated with the accounts, and compared the demographic information associated with the UI claims to the Citibank Demographics.

61.    DOL-OIG data scientists analyzed the data using nine criteria often associated with fraudulent UI claims, including:

a. Account Address Outside AZ – The mailing address listed on the Citibank account was not in Arizona, despite the account receiving benefit payments from Arizona DES.

b. Account/Claim Email Mismatch – The email address listed on the Citibank account does not match the email associated with one (or more) of the UI claims from which benefits were paid into the Citibank account.

c. Account/Claim SSN Mismatch – The SSN listed on the Citibank account does not match the SSN used to file one (or more) of the UI claims for which benefits were paid into the Citibank account.

d. Claims from Multiple SSNs into Account – UI claim benefits associated with multiple SSNs were deposited into the same Citibank account.

e. Account/Claim Address Mismatch – The mailing address listed on the Citibank account does not match the mailing address listed on one (or more) of the UI claims from which benefits were paid into the Citibank account.

15

f.  Claims from Multiple States – The Citibank account was designated to receive payments via direct deposit from one or more states in addition to Arizona, even if the claim did not result in payment of benefits.

g.  Claim Filed from Out of State Internet Protocol Address ("IP") – The IP address associated with the Arizona UI claim does not appear to be physically located in the state of Arizona.

h.  Account Email Fraud Flag – The email listed on the Citibank account matches one or more fraud criteria for emails, including emails using "disposable" domains and/or emails exploiting the Gmail dotting/Yahoo dashing obfuscation techniques, and/or emails associated with UI claims filed in multiple states.

i.  Claim Email Fraud Flag – One or more emails used for the UI claims that paid into the Citibank account matched one or more fraud criteria for emails, including emails using "disposable" domains and/or emails exploiting the Gmail dotting/Yahoo dashing obfuscation techniques, and/or emails associated with UI claims in multiple states.

62.  By applying the above criteria to analysis of both the UI application and payment data on the front end with Defendant Citibank account data at the back end of each transaction, investigators identified that the claims and transactions resulting in the Defendant Property each satisfied the criteria for fraud.

63.  Specifically, analysis revealed that all but one of the Defendant Citibank accounts (99.95%) met one or more of the above-referenced fraud criteria. The below table depicts the frequency of each of the fraud criteria across all 2,094 accounts analyzed.

| Suspected Fraud Criteria | # Of Accounts | % Of Total Accounts |
|---|---|---|
| Account Address Outside AZ | 2,029 | 96.90% |
| Account/Claim Email Mismatch | 1,193 | 56.97% |
| Account/Claim SSN Mismatch | 1,214 | 57.98% |

| Suspected Fraud Criteria | # Of Accounts | % Of Total Accounts |
|---|---|---|
| | | |
| Multiple SSNs Claiming into Account | 630 | 30.09% |
| Account/Claim Address Mismatch | 2,054 | 98.09% |
| Claims from Multiple States | 361 | 17.24% |
| Claim Filed from Out of State IP | 650 | 31.04% |
| Account Email Fraud Flag | 51 | 2.44% |
| Claim Email Fraud Flag | 341 | 16.28% |

64.    Additionally, the analysis revealed that 98.81% of the Citibank accounts (2,069 of the 2,094 accounts) received Arizona DES UI claims money as a result of UI claims satisfying two or more of the fraud criteria, and approximately 56.65% of the accounts (1,186 of the 2,094 accounts) received Arizona DES UI claims money as a result of UI claims satisfying four or more of the fraud criteria, as set forth in the table below.

| Number of Satisfied Fraud Criteria | | |
|---|---|---|
| | # Of Accounts | % Of Total Accounts[2] |
| 9 Fraud Criteria Met | 6 | .29% |
| 8 Fraud Criteria Met | 78 | 3.73% |
| 7 Fraud Criteria Met | 163 | 7.78% |
| 6 Fraud Criteria Met | 313 | 14.95% |
| 5 Fraud Criteria Met | 379 | 18.10% |
| 4 Fraud Criteria Met | 247 | 11.80% |
| 3 Fraud Criteria Met | 149 | 7.12% |
| 2 Fraud Criteria Met | 734 | 35.05% |
| 1 Fraud Criteria Met | 24 | 1.15% |

---

[2] Due to decimal place rounding, the total of these percentages is 99.97%.

65.     DOL-OIG data scientists also analyzed DOL/SWA Data for UI claims filed anywhere in the United States and its territories, and determined that a total of 2,934 UI claims, filed in Arizona as well as 38 other states and territories, routed UI benefit payments to, or listed, the 2,094 Citibank accounts as bank accounts of record during some point in the UI payment process. This data demonstrates that some of the perpetrators attempted to obtain UI benefits from more than one SWA, listing the same Citibank accounts on different applications.

66.     In addition, DOL-OIG data scientists determined that 2,297 unique IP addresses were used to file and self-certify the 2,934 UI claims routing funds to, or listing, the 2,094 Citibank accounts. Of the 2,297 IP addresses used to file UI claims routing funds to the Citibank accounts, approximately 1,600 IP addresses were associated with approximately 1,949 Arizona DES claims, indicating that some perpetrators filed multiple UI claims with Arizona DES from the same IP address.

67.     Furthermore, almost 56% (896 of 1,600) of the IP addresses linked to Arizona DES claims were in IP ranges that geolocate outside the State of Arizona (including 15 IP addresses geolocated outside of the United States and its territories). Claims filed from these out-of-state IP addresses caused UI payments to be routed to 650 of the 2,094 Citibank accounts.

**C.      Arizona DES's Analysis of the Citibank Accounts and Associated UI Claims**

68.     Arizona DES conducted its own review of its UI claims data associated with the Citibank accounts. Because Arizona DES does not have access to data related to UI

claims filed with other SWAs, its analysis was narrower than that done by DOL-OIG. Even with more limited data to analyze, Arizona DES found that 1,955 (93.36%) of the 2,094 Citibank accounts were associated with at least one UI claim flagged by Arizona DES for suspected fraud.

69.     These 1,955 accounts were found to be associated with at least 2,770 UI claims flagged by Arizona DES for identity theft.

70.     The fraud indicators used by Arizona DES included, but were not limited to:

a.  The claimant backdated the UI claim and did not log in to certify that they were still unemployed and looking for work within 14 days, as required;

b.  The mailing address provided by the claimant was used more than five times;

c.  The claim was filed with an out-of-state registration IP, and the claimant did not have any history of Arizona employment;

d.  The physical address provided by the claimant was used more than five times;

e.  The password and security answer provided by the claimant was used more than four times;

f.  The same bank routing/account number provided by the claimant was used in at least one other UI claim that listed a different physical address;

g.  The claimant filed claims in another state(s);

h.  The cellphone number provided by the claimant was used more than four times;

i.  The routing/account number provided by the claimant was used more than three times; and

j.  The IP address and User-Agent string was used to file UI claims more than three times on the same day.

71.     Of the 2,094 Citibank accounts, only one Citibank account (account number 162262431) failed to satisfy any of DOL-OIG's nine fraud criteria identified above. However, this account was listed in a UI claim flagged by Arizona DES for identity theft. Arizona DES received a complaint from the true identity holder, who informed Arizona DES that she had been retired since 2004 and did not file for UI benefits in Arizona. The identity holder reported receiving an Arizona DES debit card in error to her personal residence and denied knowing who filed for unemployment benefits in her name. After the application for UI benefits was submitted, the form of payment for the claim was changed to direct deposit, which resulted in the UI benefits being deposited in the Citibank account number 162262431.

72.     In addition, review of the UI claim revealed other indicia of fraud. For instance, the claimant had no employment history in the state of Arizona and failed to provide any proof of self-employment; the claim was registered on/around June 11, 2020, but backdated to an effective date in/around February 2020; the email listed contained a name (selahaymcdaniel@gmail.com) that did not match the name of the purported claimant (A. Ryan); and, after the submission of the claim, the claimant only completed three weekly certifications before abandoning the claim.

**C.      Review of a Sample of the Citibank Accounts**

73.     In addition to conducting data analysis, the United States randomly selected five of the Citibank accounts to review and confirm that the accounts were funded by fraudulent UI claims filed with Arizona DES. Law enforcement used open-source

databases to determine geographic locations of purported account holders and UI claimants, and contacted account holders or UI claimants to determine their knowledge of, or role in, the establishment of the Arizona UI claims or related Citibank accounts.

74.     As to each of the five accounts, Arizona DES confirmed that the UI benefits paid into the accounts were based upon electronically submitted claims for PUA benefits.

75.     The investigation of these accounts revealed that all five of the accounts were flagged by DOL-OIG and Arizona DES due to the presence of one or more fraud indicators.

### i.   Citibank Account 164865697

76.     Citibank Account 164865697 (line 968 on Attachment A) is held in the name of Amy Pfister and lists an address in Pewaukee, Wisconsin. As a result of a UI claim filed with Arizona DES in the name of T. Simon and listing an address in Florence, Arizona, the account received $960 in UI benefit payments, with $721.23 in UI funds remaining in Citibank's custody as of the date of this application.

77.     In addition, there is a second account purportedly held by Pfister, Citibank account 164865689. Although the United States does not seek to seize and forfeit Account 164865689, particulars of the account are included because both accounts held in Pfister's name appear to have been funded with fraudulent Arizona UI proceeds.

78.     Simon never resided or worked in Arizona. Instead, Simon has resided in the State of Florida for more than 20 years, including during the COVID-19 pandemic. Additionally, open-source law enforcement databases revealed no relationship in proximity or acquaintance between the purported account holder, Pfister, and the purported AZ DES UI claimant, Simon.

79.     Furthermore, investigators discovered that someone using Simon's personal identifiers filed for unemployment benefits in states other than Arizona, including Florida and Kansas. With few exceptions not relevant to this application, there is no lawful scenario in which an individual could file for and receive UI benefits in multiple states over the same time period.

80.     Specific to Simon's Florida claim, which was filed on/about April 18, 2020, Simon was determined to be eligible for traditional UI benefits, having had wages reported by a Florida-based employer. However, the filer of Simon's Arizona claim had responded, "no," when asked on the October 7, 2020 Arizona PUA application, "[d]uring the past two years, have you worked in a state other than Arizona?"

81.     If the Arizona applicant would have correctly responded, "yes," AZ DES would likely have scrutinized the claim for fraud and/or eligibility issues due to collection of unemployment benefits in multiple, non-contiguous states.

82.     Although the Simon UI claim listed a Florence, Arizona address, AZ DES records revealed that the UI claim was filed using an IP address registered in Salem, New Hampshire. A subsequent log-in was made using an IP address registered in Stone Mountain, Georgia.

83.     In addition, Citibank account 164865689, the second Citibank account purportedly held by Pfister, received $960 from Arizona DES as a result of a UI claim filed by T. Green on/about October 7, 2020.

84.     Despite the filer of the T. Green Arizona claim purporting to have earned approximately $77,000 in Arizona income during 2019, the State of Arizona noted that this

individual had no record of employment or wages within Arizona.

85.    The IP address used to file the T. Green claim (83.136.181.136) was also linked to approximately 36 additional UI claims during September and October of 2020, with 20 claims filed against Arizona and 16 filed against Pennsylvania. Arizona and Pennsylvania stopped 34 of these 36 claims, which resulted in no UI benefit payouts.

86.    Of additional note, someone using T. Green's identifiers also filed a UI claim against the State of Florida on or about December 26, 2020.

87.    Finally, law enforcement interviewed Pfister, the purported owner of Citibank accounts 164865697 and 164865689. Pfister stated she lives in Pewaukee, Wisconsin, which was confirmed by law enforcement.

88.    Pfister told law enforcement that she has never banked with Citibank and that she does not recognize or hold Citibank accounts 164865697 or 164865689.

89.    Pfister also said that she does not know the purported Arizona UI beneficiary Simon, whose Arizona UI funds paid into Citibank account 164865697.

90.    Pfister further stated that she does not know the purported Arizona UI beneficiary Green, whose Arizona UI funds paid into Citibank account 164865689.

91.    Pfister told law enforcement she did not authorize anyone to perform any business or financial transactions on her behalf.

92.    Pfister stated that the Social Security number, address, date of birth, and email address used to open Citibank account 164865697 were correct, however the phone number associated with the account was not hers.

93.    Pfister stated that she held a full-time job during the COVID-19 pandemic

and has never applied for unemployment benefits.

### ii.  Citibank Account 165484248

94.     Citibank account 165484248 (line 65 on Attachment A) is held in the name of Lindsey Cadrette, and lists an address in St. Clair Shores, Michigan. Law enforcement database queries of Cadrette confirm that she resides in or around St. Clair Shores, Michigan.

95.     As a result of a UI claim filed with Arizona DES in the name of J. Ramsdale and listing an address in Phoenix, Arizona, AZ DES paid $2,160 in UI benefits into Citibank account 165484248, with $695.57 of these benefit funds still held at Citibank.

96.     Ramsdell has been a longtime resident of the state of Washington, with no ties to Arizona or Cadrette.

97.     In addition, the Ramsdell UI claim, which was filed on October 3, 2020, was flagged by Arizona DES for suspected identity theft. The IP address used to file the claim was also used to register 1,432 pandemic UI claims, with 618 of those claims also filed on October 3, 2020. The October 3, 2020 claims used identical or slightly modified versions of the same addresses and some of the UI claims (although not the Ramsdell UI claim) used suspicious email addresses. For instance, approximately 320 emails listed on those claims started with the prefix, "RRWHQOWZSDASASHEYD" followed by a series of numbers, such as "RRWHQOWZSDASASHEYD92631@gmail.com." The most recent login IP address associated with these suspicious claims was used over 1,021 times on November 29, 2020, within minutes of when Ramsdell, or someone using his name, completed a weekly certification to continue receiving UI benefits.

98.     The filer of the Ramsdell UI claim never attempted to verify "his" identity through ID.me (a third-party identity verification service with which AZ DES contracted), never called Arizona DES to inquire about the claim, and never uploaded any of the required documentation for eligibility.

99.     The filer of the Ramsdell UI claim also did not provide any employment details for any verifications and Arizona DES has no record of any in-state or out-of-state wage history.

100.    Although the Ramsdell UI claim listed a physical address in Arizona, at one time, it listed Central National Bank & Trust bank account for receiving UI benefit payments. Central National Bank & Trust only has physical branches and ATMs in the Kansas City area. It does not have any branches in Arizona.

101.    Law enforcement interviewed Cadrette, the purported owner of Citibank account 165484248.

102.    Cadrette said that she did not know Ramsdell and would not have authorized anyone to conduct any financial transactions on her behalf.

103.    Cadrette stated that she was unemployed for six months due to the COVID-19 pandemic. During that time, she applied for, and received, Michigan UI benefits.

104.    Cadrette also shared that, during the COVID -19 pandemic, she received a call from Citibank informing her that a suspicious account was established in her name and Arizona DES benefits had been deposited into that account under suspicious circumstances.

105.    Cadrette stated that she has lived in the state of Michigan her entire life. She

has never traveled to Arizona.

### iii. Citibank Account 6865335130

106. Citibank account 6865335130 (line 1852 on Attachment A) is held in the name of Jordan Foster and lists an address in Trumansburg, New York. As a result of a UI claim filed with Arizona DES in the name of R. McCoy and listing an address in Glendale, Arizona, AZ DES paid $9,321 in UI benefit payments to Citibank Account 6865335130.

107. The address on the UI claim (Glendale, Arizona) and Citibank account 6865335130 (Trumansburg, New York) do not match.

108. McCoy has been a longtime resident of the Glendale, Arizona area, whereas Foster resides in upstate New York.

109. The IP address associated with the McCoy UI claim was flagged for fraud by Arizona DES because it was used to file five UI claims on the same day.

110. The email address used for the McCoy UI claim (RMCCOY08@ICHIGO.ME) also matched AZ DES criteria for suspicious emails, because it appeared to be "disposable." Emails using certain domain names (i.e., the routing information provided after the "@" in an email address) are temporary or disposable, and therefore, can be used by bad actors to mask their electronic footprint while engaging in fraudulent activity. The domain name "…@ichigo.me" is such a disposable email address.

### iv. Citibank Account 9348297248

111. Citibank account 9348297248 (line 1470 on Attachment A) is held in the name of Lisbeth Peralta and lists an address in East Orange, New Jersey. As a result of UI claims filed with Arizona DES in the names of G. Combs and S. Rubino, and listing

addresses in Sun City, Arizona and East Orange, New Jersey, respectively, AZ DES paid a total of $5,553 in benefits, with Citibank still holding $3,946 of those benefits.

112.    The same day those claims were filed, additional UI claims in the name of K. Marechek were filed with Arizona DES and the Vermont Department of Labor. Both Marechek claims listed Citibank account 9348297248 as the bank account of record. Neither SWA paid benefits based on these Marechek claims.

113.    There is no evidence that Peralta ever lived in Arizona. Rather, it appears she lived in the East Orange, New Jersey area and Central Florida.

114.    Additionally, the address used on the Combs claim (in Sun City, Arizona) does not match residency data for Combs, which suggests he recently resided in New Jersey and Connecticut.

115.    The phone number, Social Security number, date of birth, and email address provided to Citibank do not match the phone number, Social Security number, date of birth, and email address provided on either the Combs or Rubino UI claim.

### v.   Citibank Account 40500219333

116.    Citibank account 40500219333 (line 835 on Attachment A) is held in the name of Janna Zepp and lists an address in Temple, Texas. There is no record of Zepp living in Arizona.

117.    Zepp is named as the holder of a second account, Citibank account 40500219320. Although the United States does not seek to seize and forfeit Account 40500219320, particulars of the account are included because both accounts held in Zepp's name appear to have been funded with fraudulent Arizona UI proceeds.

118.   In an interview with law enforcement, Zepp confirmed that she lived in Texas. She confirmed that she has never resided in the state of Arizona, and reported that the last time she visited the state was over 30 years ago.

119.   Zepp also said that she has never opened a bank account with Citibank and did not recognize or hold Citibank account 40500219333 or 40500219320.

120.   As a result of a UI claim filed with Arizona DES in the name of C. Snoe and listing an address in Tempe, Arizona, Arizona DES paid $960 in UI benefits into Citibank account 40500219333, with $720.32 in UI funds remaining in Citibank's custody as of the date of this complaint.

121.   There is no information indicating that Snoe ever lived in Arizona. Rather, it appears she lived in or around McClennan County, Texas when the UI claim was filed with Arizona DES.

122.   The Snoe UI claim was filed from an IP address that does not appear to be physically located in Arizona. Based on IP address location query websites, the IP address appears to resolve to a location in California.

123.   During a law enforcement interview, Zepp told investigators that she has been employed full time for the last 10 years, including during the COVID-19 pandemic. She denied ever applying for UI benefits from the state of Arizona. She also denied authorizing anyone to conduct any financial or business transaction on her behalf.

124.   Zepp denied knowing Snoe. Aside from Zepp and Snoe apparently living within approximately 50 miles of each other in Texas, there are no cognizable linkages between the two.

125.    Arizona DES flagged the Snoe UI claim for suspected fraud because, at one time, Snoe's UI claim listed a different financial institution's bank account that was associated with an Arizona DES fraud investigation. Arizona DES Office of Inspector General (OIG) worked with that financial institution early in the COVID-19 pandemic to return over $57 million in fraud deposits going to prepaid Visa debit cards. That investigation revealed many of the same fraud indicators as described in this application. During the UI claims process, Arizona DES allowed for claimants to change their bank account and routing information at the discretion of the claimant, which allowed the banking information for the Snoe claim to be changed to Citibank account 40500219333.

126.    As noted above, another Citibank account, 40500219320, was fraudulently opened in Zepp's name and was also involved in the fraud on Arizona DES.

127.    As a result of a UI claim filed with Arizona DES in the name of A. Tucker, $720 in UI benefit payments were paid into Citibank account 40500219320.

128.    Zepp denied knowing Tucker.

129.    The IP address used to file Tucker's UI claim, 47.144.222.199, resolved to a location in the State of California, and was linked to seven other UI claims filed with Arizona DES in September and October 2020, which paid out a total of $3,936.

130.    In summary, based on data analytics by law enforcement, the State of Arizona and Citibank, and through victim interviews, and other investigative techniques, law enforcement has determined that as a result of 2,904 fraudulently-submitted Arizona unemployment claims, $6,973,984.14, constituting the Defendant Property, was deposited into, and remain within, accounts listed at Attachment A, which accounts were created for

the purpose of receiving fraud proceeds.

## CLAIM FOR RELIEF

131.   The United States realleges, adopts, and incorporates all allegations stated in paragraphs 1 to 130 as though fully set forth herein.

132.   The facts set forth herein support a reasonable belief that the government will be able to show, by a preponderance of the evidence, that the Defendant Property constitutes or is derived from proceeds traceable to a wire fraud, 18 U.S.C. § 1343, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court find that probable cause exists and issue a warrant of arrest in rem issue for the arrest of the Defendant Property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 16th day of February, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Joseph Bozdech*
JOSEPH BOZDECH
Assistant United States Attorneys

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Brooks Abramson, verify and declare under penalty of perjury that:

I am a Special Agent with the United States Department of Labor, Office of Inspector General. I have read the foregoing Complaint for Forfeiture *In Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true and correct. I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 15th day of February, 2024.

Brooks Abramson
Senior Special Agent
United States Department of Labor
Office of Inspector General