**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-24-00331-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| $6,973,984.14 in US Currency, | |
| Defendant. | |

Before the Court is Plaintiff's (the "Government") Motion for Default Judgment of Forfeiture. (Doc. 22.).  On February 16, 2024, the United States of America filed this civil in rem forfeiture action against "Approximately $6,973,984.14 Held in 2,094 Citibank Accounts Listed in Attachment A" (the "Currency"). (Doc. 1.)  Because no party appeared, answered, or otherwise pleaded, the Clerk of Court entered default on March 6, 2025. (Doc. 9.)  The Government now moves for default judgment pursuant to Fed. R. Civ. P. 55(b) and Supplemental Rule G.  For the reasons set forth below, the Government's motion will be **granted**.

## I.    FACTUAL BACKGROUND

Because the Clerk entered default, the Court will take the Complaint's factual allegations as true.  *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (stating that upon default, a complaint's allegations are taken as true, except those relating to damages).  The following facts were alleged in the Complaint.

### A. Arizona's Unemployment Insurance Program and Pandemic Benefits

Unemployment Insurance ("UI") is a joint state-federal program that provides temporary financial assistance to eligible workers who are unemployed through no fault of their own. (Doc. 1 at 3.) State workforce agencies ("SWA") administer their respective UI programs in accordance with federal law and regulations. (*Id.*) In Arizona, the Arizona Department of Economic Security ("Arizona DES") administers the state's UI program. (*Id.* at 4.)

In response to the COVID-19 pandemic, Congress enacted several statutes that expanded UI benefits and created new, temporary benefit programs. (*Id.* at 4–5.) These included the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. (*Id.*) The CARES Act provided for three temporary UI programs: (1) Pandemic Unemployment Assistance ("PUA"); (2) Pandemic Emergency Unemployment Compensation ("PEUC"); and (3) Federal Pandemic Unemployment Compensation ("FPUC"). (*Id.* at 5.) Under these temporary programs, eligible individuals could receive weekly UI benefits, including supplemental federal payments, for extended periods. (*Id.* at 5–7.)

Pandemic-related UI funds were distributed to Arizona DES through the United States Department of the Treasury. (*Id.* at 8.) Payments were transmitted electronically via Automated Clearing House ("ACH") transfers and ultimately disbursed by Arizona DES to approved claimants, either by check, prepaid debit card, or direct deposit to bank accounts designated by claimants. (*Id.* at 8, 10.)

Arizona DES administered these benefits through an online application system. (*Id.* at 8.) Through the online application, applicants seeking benefits under PUA were "required to answer specific questions to establish their eligibility, including their name, Social Security number, and mailing address." (*Id.* at 9.) "PUA applicants were also required to self-certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable to work on or after January 27, 2020 through

1    December 31, 2020." (*Id.*)  The applicants were also "required to self-certify that they
2    understood the civil and criminal ramifications for submitting false statements." (*Id.*)

3        The PUA program did not require applicants to submit documentation to establish
4    their identify or prove they were eligible for benefits. (*Id.* at 10.)  The program also did
5    not vet or verify the Arizona residential address that PUA applicants provided. (*Id.*)

6        **B. Fraud Investigation**

7        The Secret Service, in coordination with other federal agencies including the United
8    States Department of Labor—Office of Inspector General ("DOL-OIG"), conducted a
9    nationwide investigation into suspected UI fraud involving thousands of claims submitted
10    to SWAs and thousands of bank accounts designated to receive UI benefit payments. (*Id.*
11    at 11–12.)  The investigation discovered that "organized criminal groups were engaging in
12    schemes to defraud SWAs by using personally identifiable information ('PII') of United
13    States citizens, along with fabricated employment information, to file fraudulent
14    applications for UI benefits online." (*Id.* at 11.)  Arizona DES was one of the SWAs
15    victimized by the fraud schemes. (*Id.* at 12.)  "[A]s a result of the fraudulent UI benefit
16    claims relevant to this Complaint, Arizona DES caused Bank of America (headquartered
17    in North Carolina) to electronically transfer benefit payments to Citibank, N.A.
18    (headquartered in New York) for deposit into the subject accounts." (*Id.*)

19        Through subpoenas and data-sharing agreements, DOL-OIG obtained UI claims
20    data from all 54 SWAs and banking records associated with accounts that received UI
21    payments. (*Id.* at 13.)  The Government "obtained documentation pertaining to the
22    Citibank accounts, including demographic data on the reported owners of the suspected
23    fraudulent accounts.  The data included information such as first name, last name, Social
24    Security number, date of birth, residential address, city, state, and email address." (*Id.* at
25    15.)

26        DOL-OIG data scientists and special agents conducted data analyses of the data for
27    the UI claims associated with the accounts at issue in the Complaint. (*Id.*)  The data
28    scientists and investigators analyzed this information using the nine criteria often

associated with fraudulent UI claims including: (1) mailing address listed on Citibank account was not in Arizona; (2) email address listed on Citibank account did not match email associated with the UI claim; (3) social security number ("SSN") listed on Citibank did not match the number used to file the UI claim; (4) UI claim benefits associated with multiple SSNs were deposited into the same Citibank account; (5) mailing address listed on the Citibank account did not match the mailing address listed on the UI claims; (6) Citibank account was designated to receive payments from one or more states in addition to Arizona; (7) IP address associated with Arizona UI Claim was not physically located in Arizona; (8) email listed on the Citibank account matched one or more fraud criteria for emails; and (9) one or more emails used for the UI claims that paid into the Citibank account matched one or more fraud criteria for emails.  (*Id.* at 15–16.)

This analysis revealed widespread fraud associated with the Citibank accounts at issue.  (*Id.* at 16.)  "[A]ll but one of the Defendant Citibank accounts (99.95%) met one or more of the above-referenced fraud criteria."  (*Id.*)  "98.81% of the Citibank accounts (2,069 of the 2,094 accounts) received Arizona DES UI claims money as a result of UI claims satisfying two or more of the fraud criteria, and approximately 56.65% of the accounts (1,186 of the 2,094 accounts) received Arizona DES UI claims money as a result of UI claims satisfying four or more of the fraud criteria."  (*Id.* at 17.)  Arizona DES conducted its own review of the UI claims and found that "1,955 (93.36%) of the 2,094 Citibank accounts were associated with at least one UI claim flagged by Arizona DES for suspected fraud."  (*Id.* at 18–19.)  The one account that failed to satisfy any of DOL-OIG's fraud criteria was "listed in a UI claim flagged by Arizona DES for identify theft."  (*Id.* at 20.)

To confirm the results of the data analysis, the Government conducted an in-depth review of five randomly selected Citibank accounts that received Arizona UI benefit payments.  (*Id.* at 20–21.)  In each instance, the associated UI claims contained false or inconsistent information, were submitted from IP addresses located outside Arizona, or involved claimants who had no employment history in Arizona.  (*Id.* at 21–29.)  Law

1    enforcement interviewed several of the individuals whose names were used to open the
2    accounts or file UI claims.  (*Id.*)  These individuals denied applying for Arizona UI benefits,
3    denied owning the accounts at issue, and denied authorizing any transactions.  (*Id.*)

## II.    PROCEDURAL HISTORY

5            On February 16, 2024, the Government filed a Verified Complaint for Forfeiture In
6    Rem against the Currency.  (Doc. 1.)  The Government alleges that the Currency constitutes
7    or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, a
8    specified unlawful activity under 18 U.S.C. §§ 1956(c)(7) and 1961(1).  Based upon a
9    finding of probable cause, on February 20, 2024, the Court issued a warrant of arrest in
10   rem for the Currency, and ordered the United States Postal Inspection Service to arrest and
11   to maintain legal, physical and/or constructive custody of the defendant property until
12   further order.  (Doc. 3.)

13           Pursuant to the warrant of arrest in rem, Citibank transferred $6,550,729.16 to the
14   Government.  (Doc. 5 at 1.)  Citibank advised that $423,254.98 held in 67 accounts had
15   been remitted to third parties prior to issuance and execution of the warrant and therefore
16   was not seized.  (*Id.*)  On the Government's motion, the Court granted partial dismissal and
17   dismissed from this action the $423,254.98 held in 67 accounts that had been remitted prior
18   to execution of the warrant.  (Doc. 7.)

19           No person or entity filed a verified claim or answer contesting forfeiture of the
20   Currency within the time permitted.  The Clerk of Court subsequently entered default
21   against all potential claimants.  (Doc. 9.)  The Government now seeks default judgment
22   forfeiting the Currency to the United States.

## III.    LEGAL STANDARD

24           Once default is entered, the Court may enter default judgment under Rule 55(b).
25   Deciding to grant default judgment is discretionary but the Court must consider: (1) the
26   possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim;
27   (3) the sufficiency of the complaint; (4) the amount in controversy; (5) the possibility of a
28   factual dispute; (6) whether the default was due to excusable neglect; and (7) the strong

preference to decide cases on the merits.  *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).  Further, the Government must fully comply with forfeiture procedures.  *United States v. $27,800 in U.S. Currency*, 2017 WL 6345394, at *2 (S.D. Cal. 2017).

## IV.    DISCUSSION

For the reasons set forth below, the Court finds the Government has complied with the forfeiture procedures in 18 U.S.C. § 981(a)(1)(C) and has satisfied the *Eitel* factors. Default judgment is thus warranted.

### A.  Compliance with Forfeiture Procedures

As a threshold matter, the Court finds that the Government has established that the Currency constitutes proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud), and is therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  Section 981(a)(1)(C) provides for the civil forfeiture of any property which constitutes or is derived from proceeds traceable to various offenses, including any offense that is a "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).  That definition incorporates by reference the offenses listed in 18 U.S.C. § 1961(1), which include wire fraud in violation of 18 U.S.C. § 1343.

To obtain civil forfeiture, the Government must comply with the forfeiture procedures set forth in Supplemental Rule G.  Subsection (5)(a)(i) of that Supplemental Rule requires that once the government has complied with subsections two through four of the Rule (setting forth the requirements for the complaint, judicial authorization and process, and notice), "[a] person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending."  "Unless the court for good cause sets a different time," the claim must be filed "by the time stated in a direct notice sent under Rule G(4)(b)."  Fed. R. Civ. P. Supp. G(5)(a)(ii)(A).  This stated time must be within "at least 35 days after the notice is sent."  Fed. R. Civ. P. Supp. G(4)(b)(ii)(B).  Where the government publishes notice of an action, a claimant who was not sent direct notice may file a claim "no later than 60 days after the first day of publication on an official internet government forfeiture site."  Fed. R. Civ. P. Supp. G(5)(a)(ii)(b).

1  After filing a claim, "[a] claimant must serve and file an answer to the complaint or a

2  motion under Rule 12 within 21 days after filing a claim." Fed. R. Civ. P. Supp. G(5)(b).

3  The Government has satisfied the procedural requirements of 18 U.S.C.

4  § 981(a)(1)(C) and Supplemental Rule G, and has thus complied with all necessary

5  requirements to bring this forfeiture action.

6  First, as required by Supplemental Rule G(2), the Government filed a complaint on

7  February 16, 2024, stating the grounds for jurisdiction and venue, describing the property

8  being forfeited with reasonable particularity, identifying the statute under which the

9  forfeiture action was brought, and setting forth ample factual detail to support a reasonable

10  belief that the Government would be able to meet its burden of proof at trial.  (Doc. 1.)

11  Second, pursuant to Supplement Rule G(3), the Court issued a warrant authorizing

12  the United States Postal Inspection Service to arrest and maintain legal, physical, and/or

13  constructive custody of the Currency until further order of the Court.  (Doc. 3.)

14  Third, the Government provided notice of the forfeiture action in accordance with

15  Supplemental Rule G(4).  On or about March 8, 2024, the Government sent direct notice

16  of this action to all known potential claimants via email.  (Doc. 22 at 2, Doc. 9-1.)  The

17  notice included a cover letter containing the information required by Supplemental Rule

18  G(4)(b)(ii), a copy of the verified complaint, and notice of the availability of a United States

19  Magistrate Judge.  (*Id.*)  After 782 of the emailed notices were returned as undeliverable,

20  on or about April 11, 2024, the Government sent supplemental direct notice by First Class

21  U.S. Mail to those potential claimants, again including a cover letter satisfying

22  Supplemental Rule G(4)(b)(ii) and a copy of the complaint.  (*Id.*)  The notice advised

23  potential claimants of the deadline to file a verified claim and answer as required by

24  Supplemental Rule G(5).

25  Finally, the Government provided notice by publication.  Pursuant to Supplemental

26  Rule G(4)(b), the Government posted notice of the forfeiture on an official government

27  website, www.forfeiture.gov, for at least 30 consecutive days starting on March 11, 2024.

28  (Doc. 4.)

Because the Government has fully complied with all necessary requirements to proceed with this forfeiture action, the analysis shifts to the *Eitel* factors and whether the Government is entitled to a default judgment.

## B. *Eitel* Factors

### 1. Prejudice to Plaintiff

Denying default judgment would "unduly prejudice the Government because it would be required to litigate this action even though no potential claimants have appeared to contest the forfeiture." *See $27,800 in U.S. Currency*, 2017 WL 6345394, at *4 (citing *United States v. Approximately $28,000 in U.S. Currency*, 2010 WL 1340110, at *4 (N.D. Cal. Apr. 5, 2010) (pointing out prejudice where the government would have to expend further time and effort in an action that has no opposing party)). The first *Eitel* factor weighs in favor of entering default judgment.

### 2. Merits of the Claim and Sufficiency of the Complaint

Under 18 U.S.C. § 981(a)(1)(C), the government must prove by a preponderance of the evidence that the Currency constitutes, or is derived from, proceeds traceable to certain offenses, including wire fraud under 18 U.S.C. § 1343. *See* 18 U.S.C. § 983(c)(1); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002).

Wire fraud requires proof of (1) a scheme to defraud, (2) use of interstate wires in furtherance of the scheme, and (3) specific intent to defraud. *United States v. McNeil*, 320 F.3d 1034, 1040 (9th Cir. 2003) (citing *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001). The government may establish its case using a combination of direct and circumstantial evidence. *United States v. Currency, U.S. $42,500*, 283 F.3d 977, 980 (9th Cir. 2002).

The facts set forth in the Complaint establish that the Currency is property traceable to wire-fraud. The Complaint alleges a scheme to defraud the Arizona DES and the federal government by submitting fraudulent online UI applications. Applicants were required to self-certify eligibility and provide identifying information, including names, SSNs, and mailing addresses, but Arizona DES did not require documentation or independent

verification of identify or eligibility for PUA benefits.  Investigators determined that organized actors used stolen personally identifiable information and fabricated employment data to submit thousands of fraudulent applications.

As a result of the fraudulent scheme, Arizona DES caused Bank of America (headquartered in North Carolina), which is Arizona DES's financial institution, to transfer millions of dollars, including the Currency, for deposit into accounts at Citibank (headquartered in New York).  The use of interstate wires in the transmission of applications and benefit payments satisfies the interstate wire element.

The Complaint also demonstrates the requisite intent to defraud.  Data scientists and special agents used nine commonly recognized criteria for detecting UI fraud.  The data scientists and agents analyzed the UI application and payment data. The investigators identified multiple fraud indicators across thousands of accounts, including mismatched SSNs, out-of-state addresses, claim benefits from multiple SSNs deposited into one account, claims filed from out-of-state IP addresses, and multiple deposits from different states into single accounts.  The analysis revealed that all but one of the accounts at issue met at least one fraud criterion, 98.81% of the Citibank accounts satisfied two or more criteria, and approximately 56.65% met four or more criteria.  The single account that met no criteria was separately flagged for identity theft by Arizona DES based on a complaint from the individual whose PII was used to open the account.

To verify these findings, the Government conducted an in-depth review of five randomly selected Citibank accounts.  The investigation of these accounts revealed that all five of the accounts were flagged due to the presence of one or more fraud indicators. Moreover, each of these five accounts received UI benefits issued by the Arizona DES to a different individual than the account holder.  The three account holders who were interviewed each denied any knowledge of either the specific Citibank accounts at issue or the person in whose name UI benefits were paid out.  This random sampling corroborates the broader fraud analysis, confirming that the accounts received proceeds from fraudulently submitted UI applications.

Taken together, these allegations and investigative findings establish, by a preponderance of the evidence, that the Currency constitutes proceeds traceable to violations of 18 U.S.C. § 1343. Thus, both the merits of the claim and sufficiency of the complaint *Eitel* factors favor default judgment.

### 3. Amount in Controversy

Under the fourth *Eitel* factor, "the Court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1050 (N.D. Cal. 2010) (cleaned up). When the amount at stake is substantial or unreasonable in light of the allegations in the complaint, default judgment is disfavored. *See Eitel*, 782 F.2d at 1472 (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings). "However, when the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1100 (N.D. Cal. 2014) (quotation marks omitted).

Here, the Currency consists of approximately $6,550,729.16 in funds held across over 2,000 Citibank accounts. While the total sum is substantial, the amount seized and forfeited from each individual account is relatively modest—the accounts range from hundreds of dollars to approximately $43,000—reflecting the specific proceeds of fraudulent deposits into each account. (*See* Doc. 1-1.) The aggregated amount is therefore reasonable when considering the scope and seriousness of the fraudulent scheme.

Additionally, no person has come forward to challenge the forfeiture, despite the known potential claimants receiving direct notice of this case. Thus, default judgment is reasonable in relation to the defaulting parties' conduct. *See, e.g.*, *United States v. Approximately $94,600 in U.S. Currency*, 2018 WL 2215845, at *8 (N.D. Cal. 2018) (finding this factor favors default judgment in forfeiture case where "the Currency

represents the entire amount of money actually seized" and "[n]o person has come forward to challenge the forfeiture").

### 4. Dispute Concerning Material Facts

No claim or answer has been filed, so there is no possibility of a factual dispute by any potential claimant. "Because upon entry of default, all well-pleaded facts in the complaint are taken as true, the fifth factor weighs in favor of default judgment when the claims in the complaint are well-pleaded." *Durland v. Straub*, 2022 WL 2704169, at *7 (D. Or. 2022)(cleaned up). The fifth *Eitel* factor supports default judgment.

### 5. Excusable Neglect

There is no evidence in the record to suggest the default was due to excusable neglect by any potential claimant. Further, the Government has complied with all noticing requirements. Thus, the sixth is factor supports default judgment.

### 6. Policy Favoring Judgment on the Merits

The seventh *Eitel* factor generally weighs against default judgment. *See Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, *4 (D. Ariz. 2020). However, because no party has filed a valid claim or answer, a decision on the merits here is "impracticable, if not impossible." *See $27,800 in U.S. Currency*, 2017 WL 6345394, at *4 (quoting *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)).

## V.    CONCLUSION

Because the Government complied with the applicable forfeiture provisions and the *Eitel* factors support default judgment, the Court will grant the Government's Motion.

**IT IS ORDERED** that the Government's Motion for Default Judgment (Doc. 22) is **granted**.

**IT IS FURTHER ORDERED** that all interests in in rem defendant $6,550,729.16, consisting of $6,973.984.14 named in the Government's verified Complaint for Forfeiture In Rem less $423,254.98 dismissed by order of the Court on February 10, 2025, is forfeited to the United States of America in accordance with 18 U.S.C. § 981(a)(1)(A).

**IT IS FURTHER ORDERED** the Clerk of Court is directed to enter judgment accordingly and close this case.

Dated this 22nd day of January, 2026.

Honorable Sharad H. Desai
United States District Judge